[Nos. 917-2; 1043-2. Division Two. April 9, 1974.]

THE STATE OF WASHINGTON, *Respondent,* v. ROBERT JEWELL MONTAGUE, *Appellant.*

THE STATE OF WASHINGTON, *Respondent,* v. HOWARD R. PETERSON, *Appellant.*

*Robert G. Kerr* and *Allan L. Overland,* for appellants.

*Ronald L. Hendry, Prosecuting Attorney, Douglas D. McBroom, Chief Criminal Deputy,* and *Philip H. Brandt, Deputy,* for respondent.

PETRIE, J.—Defendants Robert J. Montague and Howard R. Peterson were convicted by jury verdict of the crime of second-degree burglary. The trial court imposed sentence upon Montague pursuant to statute. Subsequent to the jury verdict the prosecuting attorney filed a supplemental information against Peterson charging him with being an habitual criminal. By jury verdict he was found guilty and the trial court sentenced him to confinement for life. Each defendant has appealed from the judgment and sentence imposed upon him.

The basic facts are that on July 4, 1972, the lock on the front door of a dwelling in Fife, Washington, in which Robert and Suzanne Satiacum live, was broken. When Suzanne Satiacum came home at about 5:30 p.m. she attempted to open the front door and found it locked with the double lock from the inside of the house. She obtained a gun from her car, saw a man inside and heard heavy footsteps on the inside stairway. After an ineffectual exchange of gunfire between Mrs. Satiacum and a person inside the house she heard glass breaking in the back of the house and

saw two men jump through a broken window. She saw the two men run across her back yard and fired several more shots at them. One of the men shouted to the other, "Come on, Howie, come on."

Within a few minutes police officers arrived and the two defendants were found in the general vicinity, lying in the brush, and were apprehended. When apprehended, defendant Montague had $12,000 in his possession, plus a .357 magnum revolver from which at least one shot had been fired. Later, when he was being searched at the police station, $2,000 in rolled-up $100 bills fell from inside his underwear. Mrs. Satiacum testified that approximately $15,000 was missing from the house, and she also identified the two defendants as the two men she had seen running across her back yard after having jumped through a broken window.

Defendant Peterson did not testify at trial. Defendant Montague did testify that he jimmied the front door with a crowbar, entered the house, and that he later found the gun inside the house. Montague explained his presence in the house by relating a conversation he had in the latter part of June 1972, with his former cell mate, "Speedy" Velasquez, which indicated to Montague that Robert Satiacum wanted his house "ripped off." Montague had never talked to Satiacum, but his understanding, after the conversation with Velasquez, was that he (Montague) was to go to the Satiacum residence in the afternoon of July 4, remove what money he found inside, "tear up the bedroom and make it a burglary type effect," and later take two-thirds of the money to Robert Satiacum's "Smoke Shop." Montague would be permitted to retain the other one-third of the money taken from the house.

When asked whether or not it appeared unusual to him that someone wanted his house burglarized, Montague replied, "I thought it was unusual, there must have been a reason." When asked whether or not he and "Speedy" had discussed any reason, he replied:

Well, it's kind of funny like. You don't hardly talk about

those things like he really didn't say anything, but he indicated maybe something due to tax or something, you know, I don't want to know, if everything was okay, then all I had to do was go out there and pick up the money then and I got a third of it, that's all right with me.

Velasquez, who incidentally acknowledged five separate convictions for burglary or possession of burglary tools, substantiated Montague's version of the conversation. In addition, he testified that Robert Satiacum, whom he had known for a number of years, had "approached me" and "asked me if I would rip off his home for him." He told Satiacum that he wanted nothing to do with that kind of a proposition, but later he met Montague in a tavern in Tacoma and told Montague about Satiacum's offer. According to Velasquez, after Montague expressed an interest in the proposition, Velasquez then told Satiacum, "I found somebody that would do it for you, and he told me, he says okay." Timing and other details of the operation were then worked out and relayed to Montague by Velasquez.

Satiacum denied that he had any such conversation with Velasquez and also declared that he had not even seen Velasquez in over 5 years.

Montague's theories of defense are that he entered Satiacum's residence (1) at Satiacum's direction and with his consent; or at worst, (2) with the "reasonable belief" that Satiacum had given his consent not only to the entry but also to the taking of money and destruction of property inside the premises. Accordingly, he proposed several instructions in support of those theories. The trial court did instruct as to the first of these theories, as follows:

#14

A person is not guilty of burglary if he breaks and enters a house at the direction of a person who is entitled to the possession of the house.

However, the trial court refused to recognize the second theory of defense and, accordingly, refused Montague's instructions, primarily one which declared:

A person does not commit a crime by destroying prop-

erty or taking property or entering a house, if the acts are done upon a *reasonable belief* that the owner of the property destroyed or taken or of the house entered, has given his consent or direction to the taking or destruction or entry. Consent may be either expressed or implied.

(Italics ours.)

Instead, the trial court instructed the jury:

#10

You are instructed that every person who *with intent to commit some crime therein* breaks and enters any building or part thereof, or a room or other structure wherein property is kept for use, sale or deposit, is guilty of Burglary in the Second Degree.

#11

The term "break" as defined by the laws of the State of Washington relating to the crime of burglary means and includes the application of some force however slight to move some obstacle to entry, the opening, breaking or removal of a window or door whether locked or not, constitutes such breaking.

#12

The term "enter" as defined by the laws of the State of Washington relating to the crime of burglary means and includes the act of intruding any portion of the body of the person making an unlawful "breaking" as previously defined for you.

#13

*Every person who shall unlawfully break and enter* or unlawfully enter any building or structure *shall be deemed to have broken and entered* or entered the same *with intent to commit a crime therein, unless* such unlawful breaking and entering or unlawful entry shall be *explained by testimony* satisfactory to the jury *to have been made without criminal intent.*

. . .

#15

If you find from the evidence beyond a reasonable doubt all of the following alleged facts, to-wit:

1. That the defendant, ROBERT JEWELL MONTAGUE, did break and enter the dwelling house of Robert Satiacum, 5822—15th Street East. wherein was kept property for use, sale or deposit, *with intent to commit some crime therein;* and

2. That such act occurred on or about the 4th day of July, 1972, in Pierce County, Washington;

Then you shall find the defendant, ROBERT JEWELL MONTAGUE, guilty of Burglary in the Second Degree as charged in Count I of the information.

(Italics ours.)

Both defendants have assigned error to these latter five instructions on the basis that they do not adequately declare the law applicable to Montague's theory of "reasonable belief" that he entered the dwelling with Satiacum's consent to take money therefrom and to destroy property therein.

We note preliminarily that Montague's two theories of defense are not available to Peterson. The jury had no indication from either Peterson or Montague, what *Peterson's* state of mind was when he entered the Satiacum residence or even that he did enter the residence. The jury was required to ascertain the fact of Peterson's entry into the residence and his state of mind at that time solely from the other evidence in the record. Montague never mentioned or referred to Peterson in any manner whatsoever. Accordingly, any possible error in the trial court's instructions, or refusal to instruct, as to either of Montague's theories of defense would not constitute prejudicial error as to Peterson.

The total impact of the court's instructions 11 through 15 is that in order to find Montague guilty of second-degree burglary the jury must find (beyond a reasonable doubt): (1) that Satiacum's dwelling was in Pierce County; (2) that Montague broke and entered Satiacum's dwelling on July 4, 1972; (3) that when he broke and entered the house he did so with the specific intent to commit some crime therein; (4) that if he broke and entered the house unlawfully, then he is deemed to have broken and entered therein with intent to commit a crime therein unless satisfactorily explained to have been made without that specific intent; but the jury was also admonished that if Montague

entered the house at Satiacum's direction, he did not commit the crime of burglary.

We find no error in the instructions given. Indeed, the four necessary elements merely declare the appropriate statutory law.[1] The only real issue is whether or not the trial court erred by not giving the proposed instruction as to the defendant's "reasonable belief."

██ The prosecution's brief seems to contend, in part, that the instructions, taken as a whole, did permit Montague's counsel satisfactorily to argue both his theories of defense to the jury. Indeed, the trial court specifically allowed defense counsel to argue his "reasonable belief" theory. The question is whether or not, in the absence of a "reasonable belief" instruction, counsel could *satisfactorily* argue the position. A trial court is not required to give negative instructions as to matters that will not support a conviction in a criminal case. It is unnecessary to explain those things which will *not* constitute a crime, though a court may do so in the interest of clarity. *State v. Bell*, 8 Wn. App. 670, 508 P.2d 1398 (1973), *aff'd*, 83 Wn.2d 383, 518 P.2d 696 (1974).

However, a defendant in a criminal case, is entitled to have the jury fully instructed on the law as to his theory of defense. *State v. Walker*, 82 Wn.2d 851, 514 P.2d 919 (1973). Where, as in the case at bench, the trial court did present a "negative" instruction to the jury (instruction No. 14) it would seem singularly inappropriate not to present another negative instruction which more fully develops the defendant's real theory of defense—if that additional theory is the more nearly precise law applicable to the arguable facts of the case.

Before we attempt to ascertain whether or not Mon-

---

[1]RCW 9.19.020 does not require a "breaking" when the alleged burglary is committed against the "dwelling house of another . . ." However, the information charged that the defendants did "unlawfully" and feloniously "break and enter the dwelling house of Robert Satiacum." Hence, the state was obliged to prove the defendants did "break" as well as "enter" the dwelling.

tague's proposed instruction embodies the law applicable to the arguable facts of the case, it is well to consider the significance of the statute[2] which provides the basis for instruction No. 13. The specific subjective element of the crime of burglary is the intent to commit a crime in the place which has been broken and entered. By statute, when a person unlawfully breaks and enters a dwelling or other building wherein property is kept for use, he "shall be deemed" to have broken and entered with intent to commit a crime therein, unless the *evidence* satisfies the jury that the unlawful breaking and entering was "made without criminal intent." The fact of unlawfulness of the breaking and entering, once established, gives rise to a rebuttable inference that another fact exists—the state of mind necessary to complete the statutory crime of burglary.

 Thus, in the case at bench, if the jury should find that Satiacum did not *in fact* give his consent to Montague to break and enter his dwelling, would all the other elements of the crime fall into place (Montague having acknowledged that he jimmied the front door and entered the dwelling) under the instructions given? They would indeed if the jury could conclude that entry without consent is the equivalent of "unlawful" entry. This forces us to examine the concept of "unlawful" entry. The expression implies the existence of a "guilty mind," which includes (1) an intent to perform the overt acts that constitute the objective elements of the crime (Montague admitted that); plus (2) absence of every mental pattern sufficient in law to exculpate one who has performed the particular deed in question. R. Perkins, *Criminal Law* 654 *et seq.* (1957). Under

---

[2]RCW 9.19.030 provides:

"Every person who shall unlawfully break and enter or unlawfully enter any building or structure enumerated in RCW 9.19.010 and 9.19.020 shall be deemed to have broken and 'entered or entered the same with intent to commit a crime therein, unless such unlawful breaking and entering or unlawful entry shall be explained by testimony satisfactory to the jury to have been made without criminal intent."

appropriate circumstances, one such exculpatory mental pattern is "reasonable mistake of fact."[3]

■ Montague's proposed instruction is really a statement that if he was mistaken as to the fact of Satiacum's consent or direction to enter, to take whatever money was found in the house, and to destroy property therein, his entry into the house would nevertheless be insufficient to warrant his conviction of the crime of burglary as long as he had a "reasonable belief" that Satiacum had so consented or directed.[4]

In other words, Montague contends that he had a right to assume that Velasquez, as agent of Satiacum or as some type of an independent intermediary, correctly conveyed Satiacum's consent and direction to him (Montague); if, in good faith, he was in error in that regard, he simply made an honest mistake of fact for which the law should hold him excused. The concept, though not unique,[5] is totally inapplicable to the fact pattern established by Montague's own testimony.

Professor Perkins introduces the subject as follows:

> The term "honest belief", and equivalent phrases, are sometimes used to express two different ideas: (1) that the belief must have been sincere and (2) that what was done would have been proper had the facts been as they were mistakenly supposed to be.

(Footnotes omitted.) R. Perkins, *Criminal Law* 826 (1957).

It is somewhat difficult for us to envision that Montague's trust in his former cell mate constitutes a sincere, honest or genuine belief. Nevertheless, it must be conceded that a

---

[3]Other exculpatory mental patterns would include: extreme youth, mental derangement, and under some circumstances, a reasonable apprehension of compulsion or duress.

[4]When excepting to the trial court's failure to give the proposed instruction, counsel suggested, alternatively, phraseology of "bona fide, the good faith belief, reasonable grounds to believe" in lieu of "reasonable belief," none of which was acceptable to the trial court.

[5]RCW 9.54.120 provides a complete defense to the crime of larceny when property is appropriated openly and avowedly under a "good faith" belief that the taking occurred under an intent other than larcenous.

person who did want his dwelling to appear to be burglarized might well seek out the services of a repeated "loser" either to personally perform the service or to enlist the services of a "reliable" perpetrator. However, it seems quite apparent from Montague's own testimony, that what he did would not have been "proper" had the facts been as they were mistakenly supposed to be. Indeed, Montague's actions would have been more than morally reprehensible; they would, at best, have made him a principal, through aiding or abetting, to the commission of another crime or, conceivably, a principal to compounding a crime. Clearly, under any interpretation of the testimony, Montague's actions belie any possible element of "good faith." We hold, therefore, that the trial court did not err by refusing to present Montague's proposed intruction on "reasonable belief" to the jury.

We need not tarry long as to Montague's other assignments of error. There is sufficient evidence to establish that Satiacum's residence is in Pierce County. We find no abuse of discretion in the trial court's limitation—after permitting prolonged questioning—of cross-examination of Suzanne Satiacum.

We turn then to Peterson's assignments of error. He contends, first, that the trial court erred by not granting him a trial separate from the codefendant Montague. Peterson's contention is that he was "pulled down" by Montague's testimony. Montague's testimony did not in any way implicate Peterson in this crime. We find no abuse of discretion. *State v. Carter*, 4 Wn. App. 103, 480 P.2d 794 (1971).

Finally, we consider Peterson's assignments of error as they relate to the judgment and sentence imposed by reason of his having been declared an habitual criminal. By an amended supplemental information filed on December 1, 1972, the state accused Peterson of being an habitual criminal by reason of having been previously convicted of two other felonies: (1) second-degree assault committed in

Montana in 1961; and (2) second-degree burglary in King County, Washington, in 1966.

We need only consider the proof bearing upon Peterson's 1966 conviction of burglary in King County. The documentary evidence of that conviction consists essentially of a certified copy of the judgment and sentence on file in the Superior Court for King County. The document does not indicate on its face that at the time of sentence Peterson either had the assistance of or waived counsel. Further, there is no showing in the record that he had the assistance of counsel or that he waived counsel at the time judgment and sentence was imposed. Accordingly, the state has fallen short of the proof required to establish the 1966 conviction. *Burgett v. Texas,* 389 U.S. 109, 19 L. Ed. 2d 319, 88 S. Ct. 258 (1967).

As to defendant Montague the judgment is affirmed; as to defendant Peterson, the judgment is reversed with direction to impose the appropriate sentence pursuant to his conviction of the crime of second-degree burglary.

PEARSON, C.J., and ARMSTRONG, J., concur.

Petition for rehearing denied May 14, 1974.

Review denied by Supreme Court July 30, 1974.